**GDF REALTY INVESTMENTS, LTD., et al.**

v.

**Gale NORTON, et al.**

**No. A–00–CA–369SS.**

United States District Court,
S.D. Texas,
Austin Division.

Aug. 30, 2001.

R. James George, Jr., George Donaldson & Ford, Austin, TX, Paul M. Terrill, Hazen & Terrill, P.C., Austin, TX, for plaintiffs.

Mark A. Brown, Environment & Natural Resources, U.S. Department of Justice, Washington, DC, Janet Spaulding, U.S. Department of Interior, Albuquerque, NM, David Gayer, U.S. Department of Interior, Office of the Solicitor, Washington, DC, for defendants.

David O. Frederick, Frederick Law, Austin, TX, for National Wildlife Foundation, amicus.

David E. Haddock, M. Reed Hopper, Sacramento, CA, Pacific Legal Foundation, amicus.

Allan E. Parker, Jr., Texas Justice Foundation, San Antonio, TX, for Texas Justice Foundation, amicus.

### ORDER

SPARKS, District Judge.

BE IT REMEMBERED on the 30th day of August 2001 the Court reviewed the file in the above-captioned case and specifically Plaintiffs' Summary Judgment Motion and Brief in Support [# 25] and defendants' opposition thereto [# 31]; Defendants' Summary Judgment Motion [# 30] and Memorandum of Law in Support [# 31], plaintiffs' amended response thereto [# 39], defendants' reply thereto [# 41] and plaintiffs' supplemental letter brief [# 47]. After considering the motions, responses and supplemental brief, the case file as a whole and the applicable law, the Court enters the following opinion and order.

This is a declaratory relief action and request for injunctive relief brought by plaintiffs GDF Realty Investments, Ltd., Parke Properties I, L.P. and Parke Properties II, L.P. ("plaintiffs") against defendants Gale Norton and Marhsall P. Jones, in their official capacities as Secretary of the Interior and Director of the U.S. Fish and Wildlife Service, respectively ("defendants").[1]

### Factual and Procedural Background

Sometime in 1983, plaintiffs bought approximately 216 acres of undeveloped land in Travis County, Texas, near the intersection of two major state highways, FM 620 and FM 2222 ("the Property"). *See* Complaint, ¶ 30; *see also* Plaintiffs' Summary Judgment Motion, Ex. C, Affidavit of Fred Purcell ("Purcell Affidavit"), ¶¶ 1–3 and Tab 1. The Property is home to six species of invertebrates that, outside of museum and research collections, are located entirely within underground caves in Travis and Williamson Counties, in central Texas. *See, e.g.,* Plaintiffs' Summary Judgment Motion, Ex. A.[2] Shortly after buying the

---

1. Although plaintiffs originally brought this lawsuit against Bruce Babbitt and Jamie Rappaport Clark, in their respective capacities as Secretary of the Interior and Director of the Fish & Wildlife Service, defendants Norton and Jones are the current successors to these positions, following the 2000 presidential election. Accordingly, Norton and Jones, in their official capacities, are "automatically substituted" as the defendants in this lawsuit. *See* Fed.R.Civ.P. 25(d)(1).

2. These six species are: (1) the Tooth Cave pseudoscorprion (*Microcreagis texana*); (2) the Tooth Cave spider (*Leptoneta myopica*); (3) the Bee Cave Creek harvestman (*Texella reddelli*); (4) the Tooth Cave ground beetle (*Rhadine persephone*); (5) the Kretschmarr Cave mold beetle (*Texamaurops reddelli*); and (6) the Bone Cave harvestman (*Texella reyesi*). Hereafter, the Court will collectively refer to these six species as "the Cave Species."

Property (which plaintiffs estimate has a fair market value of $60 million), plaintiffs sought to commercially develop it. *See* Purcell Affidavit, ¶¶ 3–4 ("Located at the intersection of two major highways in one of the most rapidly growing areas of Texas, the Property is an extremely valuable piece of real estate."). However, according to plaintiffs, "Defendants' land use restrictions on the Property resulting from the Endangered Species Act" have prevented plaintiffs "from making economic use of the Property." *See id.* ¶¶ 6 and 15.

In March 1985, James Reddell, assistant curator at the Texas Memorial Museum for the University of Texas, sought plaintiffs' permission to enter the Property to begin "a long-term study" of the Cave Species and other invertebrates living in the caves on the Property. *See* Purcell Affidavit, Tab 2, at FP–00234.

On September 16, 1988, the federal government, pursuant to the ESA, issued a final rule listing five of the Cave Species as endangered.[3] *See* Plaintiffs' Summary Judgment Motion, Ex. A (reprinting 53 Fed.Reg. 36029 (Sept. 16, 1988)). The final rule stated:

> Each of these species is known from only six or fewer small, shallow, dry caves near Austin in Travis and Williamson Counties, Texas. Urban, industrial and highway expansion are planned or ongoing in the area containing the cave habitat of these species. This development could result in filling or collapse of these shallow caves....

*See id.* at 32029–30. The rule further stated that four of the species were located only in Tooth Cave, Amber Cave, and Kretschmarr Cave, all in the Jollyville Plateau in Travis County. *See id.* at 36030. These caves are located on or near the Property. *See* Purcell Affidavit, Tab 1. The rule also stated all five species had been studied and collected by several scientists since the 1960s and 1970s, and articles regarding these species had been published in national scientific publications and at least one international journal. *See* Plaintiffs' Summary Judgment Motion, Ex. A, at 36030 and 36032. The rule indicated the study of these species was ongoing, stating that one reason for listing the species as endangered was "[c]ollection [of the species] for scientific or educational purposes could become a threat if [their] localities become generally known." *See id.* at 36031. The rule stated the main reason the species were listed as endangered was "[t]he primary threat to the five species comes from potential loss of habitat owing to ongoing development activities," and that the species' caves "are in an area for which a major residential, commercial, and industrial development has been proposed." *See id.* The rule concluded:

> These species require the maximum possible protection provided by the Act because their extremely small, vulnerable habitats are within an area that can be expected to experience continued pressures from economic and population growth.

*See id.* at 36032.

On March 2, 1989, shortly after this final rule was issued, defendants began asserting jurisdiction over the Property, on the grounds that plaintiffs' proposed develop-

---

**3.** The rule does not mention the Bone Cave harvestman. Although the record does not indicate when this species was placed on the endangered list, plaintiffs do not dispute it is classified as endangered by the federal government. None of the six Cave Species, however, are listed as endangered by the Texas state government. *See, e.g.,* Texas Parks and Wildlife Department, *Texas Threatened and Endangered Invertebrates,* at http://www.tpwd.state.tx.us/nature/endang/animals/invertebrates.htm (last modified Aug. 3, 2001).

ment and "commercial activities" could constitute a take of "the endangered Texas cave invertebrates." *See* Purcell Affidavit, Tab 2, at GDF 2824–30 (letter from Fish & Wildlife Service). In response, plaintiffs stated it was their intention to donate some caves on the Property to scientific research for "one year," place fences around all the caves, and commercially develop the remainder of the Property: "[A] shopping center ... will be constructed around Tooth Cave. Similar development will occur around the other caves to be donated." *See id.* at GDF 2906–08 (September 20, 1989 letter from plaintiffs).

Negotiations for commercial development of the Property continued between the parties for the next several years. According to plaintiffs, sometime in 1993 defendants asserted regulatory jurisdiction over plaintiffs' "clearing activities on the Property" as well as plaintiffs' "development activities on the Property," informing plaintiffs that these activities violated the ESA's take provision. *See* Purcell Affidavit, ¶ 18.

On June 2, 1994, defendants informed plaintiffs that their proposed development of the Property would cause "habitat destruction and degradation" and, as a result, "the development as proposed will, more likely than not, constitute an ESA Section 9 take of endangered species by 'killing' or 'harming' or 'harassing' individuals so as to increase the likelihood, or cause, actual injury by significantly impair-

ing essential breeding, feeding or sheltering behaviors." *See* Purcell Affidavit, Tab 4, at 004159 (letter from Fish & Wildlife Service). Defendants stated the five species listed in the September 16, 1988 final rule, as well as the Bone Cave harvestman, likely would be taken by the proposed development. *See id.* at 004164. Defendants also noted the proposed development would include "residential housing ... research and development facilities, a golf course, office facilities and commercial development." *See id.* at 004159.

Negotiations between the parties regarding development of the Property continued. On December 30, 1997, plaintiffs applied for several Section 10(a) incidental take permits,[4] to develop "a shopping center, a residential subdivision, and office buildings" on the Property. *See* Purcell Affidavit, ¶ 27.[5] When defendants failed to reasonably act on these applications, plaintiffs sought judicial relief. On June 7, 1999, this Court issued an order holding that defendants had, by their inaction and through a recently-filed declaration, issued a final agency action denying plaintiffs' December 1997 applications for incidental take permits under Section 10(a). The Court found defendants had acted "totally irresponsibly" in intentionally delaying a ruling on the applications, and that defendants' conduct in so doing was "simply wrong."

According to plaintiffs, at this point defendants had "established benchmarks

---

**4.** Under Section 10(a), a property owner who believes his development may constitute a "take" under Section 9 can apply to the Secretary of the Interior for an "incidental take" permit, which allows "any taking otherwise prohibited by [Section 9] if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." *See* § 16 U.S.C. § 1539(a)(1)(B).

**5.** In his affidavit, Purcell represents that, prior to these December 1997 Section 10(a) per-

mit applications, defendants "had never voiced any objections to our proposed development as a threat to the Cave Bugs." *See id.* ¶ 28. However, this statement is directly contradicted by the correspondence attached to Purcell's affidavit and discussed above, including the March 1989 and June 1994 letters from defendants, both of which directly and prominently explain defendants' belief that plaintiffs' proposed development will harm the Cave Species.

prohibiting any development of the Property above certain elevation contour lines" because of harm to the Cave Species. *See* Purcell Affidavit, ¶ 33. Also according to plaintiffs, defendants' "repeated disapproval of development plans" for the Property had deprived plaintiffs of "several lucrative opportunities for the use and enjoyment of the Property," and defendants' "restrictions on our use and enjoyment of the Property has caused and continues to cause severe economic harm." *See id.* ¶¶ 30 and 36.

While still trying to get defendants to reconsider their denial of the Section 10(a) permits, plaintiffs tried another approach by filing this lawsuit on June 15, 2000, arguing for the first time that Section 9 of the ESA was unconstitutional as applied by defendants.

The premise for plaintiffs' constitutional claim is that defendants have "consistently asserted regulatory jurisdiction over the development activities on the Plaintiffs' property," on the basis that "Plaintiffs' proposed development plans will cause 'take' of the Cave Bugs in violation of § 9(a)(1)(B) of the ESA." *See* Plaintiffs' Summary Judgment Motion, at 4. Plaintiffs contend this application of Section 9 exceeds the authority granted to Congress under the Commerce Clause of the United States Constitution. Plaintiffs therefore "seek a declaration that, as-applied to the six listed endangered cave invertebrates living on or in close proximity to Plaintiffs' property, the 'take' provision of the ESA, 16 U.S.C. § 1538(a)(1)(B), is unconstitutional." *See* Complaint, ¶¶ 9 and 59. Plaintiffs also request an order "permanently enjoin[ing] the Defendants from enforcing Section 9 of the ESA as it is applied to the Cave Bugs." *See id.* ¶ 61.

Both parties now seek summary judgment. In their motion, plaintiffs ask the Court to rule defendants' application of Section 9 exceeds Congress' authority under the Commerce Clause because it does not regulate: (1) channels of interstate commerce; or (2) an activity that "substantially affects" interstate commerce. *See* Plaintiffs' Summary Judgment Motion, at 5–6. Defendants argue plaintiffs' summary judgment motion should be denied in full. In their cross-motion, defendants ask the Court to rule that "Defendants' application of Section 1568(1)(a)(B) of the Endangered Species Act in this case is constitutional, as a valid exercise of Congressional power under the Commerce Clause." *See* Defendants' Cross Motion for Summary Judgment, at 1–2.[6]

### Summary Judgment Standard

Summary judgment may be granted if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. *See* FED. R.CIV.P. 56(c). In deciding summary judgment, the Court should "construe all facts and inferences in the light most favorable to the nonmoving party." *See Hart v. O'Brien*, 127 F.3d 424, 435 (5th Cir.1997), *cert. denied*, 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999). The standard for determining whether to grant summary judgment "is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the nonmoving party based upon the record evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir.1990). Both parties bear burdens of producing evidence in the summary judgment process. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91

---

**6.** Presumably, defendants meant to cite Section 1538(a)(1)(B), as that is the statute at issue in this case, and because there is no

Section 1568 of the ESA, much less a Section 1568(1).

L.Ed.2d 265 (1986). However, "[n]either conclusory allegations nor unsubstantiated assertions" will satisfy either party's burden. *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir.1996).

## Analysis

 Congress may only enact laws pursuant to one of its enumerated constitutional powers. *See Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137, 176, 2 L.Ed. 60 (1803). Under the Commerce Clause, Congress has the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I, § 8. Plaintiffs argue defendants' application of the ESA's take provision to the Cave Species goes beyond the scope of this power, and therefore is invalid. To succeed on this argument, plaintiffs must make a "plain showing" that defendants' application is unconstitutional. *See United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 1748, 146 L.Ed.2d 658 (2000) ("Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds.").

## I. Plaintiffs' As–Applied Challenge

This lawsuit involves an as-applied constitutional challenge to the ESA's take provision.[7] *See, e.g.,* Complaint, ¶ 9 ("Plaintiffs seek a declaration that, as-applied to the six listed endangered cave invertebrates living on or in close proximity to Plaintiffs' property, the 'take' provision of the ESA, 16 U.S.C. § 1538(a)(1)(B), is unconstitutional."); *see also* Defendants' Summary Judgment Motion, at 1–2 (seeking ruling that "Defendants' application of Section 1568(1)(a)(B) of the Endangered Species Act in this case is constitutional."). As plaintiffs repeatedly make clear, they are not raising a facial constitutional challenge in this lawsuit.[8] *See, e.g.,* Plaintiffs' Response [# 39], at 18 ("[T]his is not a facial challenge to the take provision; thus the constitutionality of Congress' act is not at issue.... [T]his case is not a facial challenge to the take provision, much less

---

7. For purposes of this lawsuit, there is no dispute that plaintiffs' proposed development of the Property would constitute a take of the Cave Species. *See, e.g.,* Plaintiffs' Summary Judgment Motion, at 10–11; Plaintiffs' Response, at 14 and n. 14. The ESA's take provision, also referred to as Section 9 of the ESA, makes it unlawful to "take" any endangered species. *See* 16 U.S.C. § 1538(a)(1)(B). The federal rules adopted for the ESA have defined "take" to include "significant habitat modification or degradation [that] actually kills or injures wildlife by significantly impairing essential behavioral patterns including breeding, feeding or sheltering." *See* 50 C.F.R. § 17.3. The record indicates defendants are applying this latter regulation, known as the "habitat modification" regulation, to plaintiffs' proposed development of the Property. *See, e.g.,* Complaint, ¶ 27; Purcell Affidavit, Tab 4, at 004159 and 004165–66; Plaintiffs' Response, at 10 n. 9. The Supreme Court has expressly upheld 50 C.F.R.

§ 17.3 on its face, as being a reasonable interpretation of the ESA. *See Babbitt v. Sweet Home Chapter of Communities of Great Or.*, 515 U.S. 687, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995).

8. A facial challenge seeks to invalidate a particular regulation "in every circumstance." *See Sweet Home*, 115 S.Ct. at 2414; *see also United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987) ("A facial challenge is ... the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."); *Stenberg v. Carhart*, 530 U.S. 914, 120 S.Ct. 2597, 2655, 147 L.Ed.2d 743 (2000) (Thomas, J., dissenting) ("The only question [in a facial challenge] is whether [defendant] has shown that no set of circumstances exists under which the Act would be valid.") (internal quotations and citation omitted).

to the ESA as a whole.").[9]

▮ A Commerce Clause challenge focuses on the activity being regulated, and its relation to interstate commerce. *See United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 1629–30, 131 L.Ed.2d 626 (1995). In an as-applied Commerce Clause challenge, the regulated activity is defined in terms of, and thus is limited to, the specific facts of the case. *See, e.g., NAHB,* 130 F.3d at 1059 (Henderson, J., concurring) (denying as-applied constitutional challenge because "application of Section 9 of ESA here acts to regulate commercial development of the land inhabited by the endangered species"); *see also Jones v. United States,* 529 U.S. 848, 120 S.Ct. 1904, 1909, 146 L.Ed.2d 902 (2000) (framing as-applied Commerce Clause challenge as "whether [the statute's] application to the private residence in the present case is constitutional"); *Lopez,* 115 S.Ct. at 1630 (citing *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), a Commerce Clause challenge to federal Act governing wheat quotas, as "sustaining the application of the Act to Filburn's activity" of home consumption); *United States v. Jimenez,* 256 F.3d 330, 337 (5th Cir.2001) (as-applied Commerce Clause challenge "turns on whether the property was used in an activity affecting interstate commerce"); *United States v. Kallestad,* 236 F.3d 225, 228 (5th Cir.2000) (analyzing specific conduct of defendant for purposes of as-applied Commerce Clause challenge); *United States v. Corp,* 236 F.3d 325, 332–33 (6th Cir.2001) (as-applied Commerce Clause challenge is "a determination on a case-by-case basis about whether the activity involved in a certain case had a substantial effect on commerce"); *United States v. Dorris,* 236 F.3d 582, 586 (10th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1635, 149 L.Ed.2d 495 (2001) ("[T]he challenge [in *Jones* ] was as applied rather than facial, as it is here. The Court in *Jones* considered the connection of a specific home to

---

**9.** Plaintiffs wisely do not raise a facial challenge. The ESA's take provision and 50 C.F.R. § 17.3 are essential parts of a larger statute reasonably enacted to regulate activities substantially affecting interstate commerce, including: balancing "economic growth and development" against preserving endangered species; preserving a natural resource that has "esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people"; and preserving the potential resources found in *every* species, including their genetic information. *See, e.g.,* 16 U.S.C. § 1531(a); *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 2298, 57 L.Ed.2d 117 (1978) (*"TVA "*) ("[T]he plain language of the Act, buttressed by its legislative history, shows clearly that Congress viewed the value of endangered species as 'incalculable.' "); *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 1168, 137 L.Ed.2d 281 (1997) ("economic consequences are an explicit concern of the ESA"). Thus, these regulations would easily survive a facial Commerce Clause challenge. *See, e.g., Gibbs v. Babbitt,* 214 F.3d 483, 497 (4th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1081, 148 L.Ed.2d 957 (2001) ("Congress undoubtedly has the constitutional authority to pass legislation for the conservation of endangered species."); *National Ass'n of Home Builders v. Babbitt,* 130 F.3d 1041, 1057 (D.C.Cir.1997), *cert. denied,* 524 U.S. 937, 118 S.Ct. 2340, 141 L.Ed.2d 712 (1998) (*"NAHB "*) ("We hold that section 9(a)(1) of the Endangered Species Act is within Congress' Commerce Clause power."). *Cf. Hodel v. Indiana,* 452 U.S. 314, 101 S.Ct. 2376, 2386 n. 17, 69 L.Ed.2d 40 (1981) ("It is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfies this test [of being rationally related to regulating interstate commerce]."); *United States v. Mitchell,* 553 F.2d 996, 1002 (5th Cir.1977) ("The nature of such a bill [the Marine Mammal Protection Act] is based on the control that a sovereign such as the United States has over the natural resources within its territory. It can exploit them or preserve them or establish a balance between exploitation and preservation.").

interstate commerce and found it wanting."). Here, the regulated activity is plaintiffs' alleged take of the Cave Species through their proposed commercial development of the Property. *Cf. Sweet Home,* 115 S.Ct. at 2412 (describing specific conduct regulated by take provision as "logging activities" destroying habitat of two endangered species).

A fundamental flaw in plaintiffs' argument is their overly-broad definition of the regulated activity at issue. Plaintiffs seek to invalidate the take provision as applied to all "takes" of the Cave Species. *See, e.g.,* Plaintiffs' Brief, at 2 ("Plaintiffs contend that the regulated activity—*takes* of the Cave Bugs—cannot be supported by the Commerce Clause.") (emphasis added); Plaintiffs' Summary Judgment Motion, at 6 ("Congress lacks authority under the Commerce Clause to regulate *takes* of the Cave Bugs on the Property.") (emphasis added); Plaintiffs' Response, at 18 ("This case presents the substantially more narrow question of whether the take provision can be constitutionally applied to the Cave Bugs."). But this lawsuit does not involve all takes of the Cave Species, or even all takes of the Cave Species on the Property. Rather, this case involves defendants' regulation of one specific take—the alleged take of the Cave Species by plaintiffs' proposed commercial development of the Property.[10]

■ Allowing plaintiffs to challenge the constitutionality of Section 9 as-applied to takes of the Cave Species in general, rather than plaintiffs' specific conduct, contradicts "the general rule that constitutional adjudication requires a review of the appli-

cation of a statute to the conduct of the party before the Court." *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 2125, 80 L.Ed.2d 772 (1984). A plaintiff can either challenge *all* applications of a statute (*i.e.,* a facial challenge), or the statute as-applied to the plaintiff's particular conduct—but he cannot take the middle ground and challenge the statute as-applied to a general class of activity into which his conduct also falls. *See, e.g., ABATE of Georgia, Inc. v. Georgia,* 137 F.Supp.2d. 1349, 1355 (N.D.Ga. 2001) ("[A]s-applied challenges are fact-specific. They cannot be brought on behalf of a class; they must be brought on a case-by-case basis."). This principle stems from the basic rule that a court may decide only the actual case or controversy that is before it:

> This Court, as is the case with all federal courts, has no jurisdiction to pronounce any statute, either of a state or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies. In the exercise of that jurisdiction, it is bound by .... the rule that one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional.... The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined.

**10.** This is not a case where a federal regulation has been enacted applying Section 9 to every possible take of the Cave Species. *Cf. Gibbs,* 214 F.3d 483 (overruling facial Commerce Clause challenge to 50 C.F.R. § 17.84, which prohibits taking of all red wolves). Nor is it a case where plaintiffs are challeng-

ing the federal regulation listing the Cave Species as endangered. *Cf. Building Indus. Ass'n of Superior Cal. v. Babbitt,* 979 F.Supp. 893 (D.D.C.1997) (overruling facial Commerce Clause challenge to listing of fairy shrimp as endangered).

*United States v. Raines,* 362 U.S. 17, 80 S.Ct. 519, 523, 4 L.Ed.2d 524 (1960). In sum, plaintiffs cannot challenge Section 9 as-applied to takes of the Cave Species in general.[11] They may challenge Section 9 as-applied only to *their* alleged take. Thus, as stated, the regulated activity in this lawsuit is plaintiffs' alleged take of the Cave Species through their proposed commercial development of the Property.

## II. Commerce Clause Analysis

■ Two recent Supreme Court decisions, *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) and *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), provide the starting point for analyzing whether defendants' application of Section 9 to plaintiffs' alleged take is a valid exercise of the Commerce Clause power. Although both cases involve facial constitutional challenges, they establish the general rule that the Commerce Clause allows regulation of three "broad categories" of activity: (1) use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) activities that substantially affect interstate commerce. *See Lopez,* 115 S.Ct. at 1629–30; *Morrison,* 120 S.Ct. at 1749. The Court finds the regulated activity in

this case easily falls under the third category.[12]

In *Morrison,* the Supreme Court set forth four "considerations" in determining whether the activity being regulated substantially affects interstate commerce. The Fifth Circuit has defined these considerations as follows:

(1) whether the statute regulates 'commerce,' or an activity that might be deemed an 'economic activity,' broadly defined;

(2) whether the statute has an 'express jurisdictional element' that restricts its application to activities that have 'an explicit connection with or effect on interstate commerce';

(3) whether congressional findings support the judgment that the activity in question has a substantial effect on interstate commerce; and

(4) whether the act made an offense has an attenuated relationship to that substantial effect on interstate commerce.

*Kallestad,* 236 F.3d at 227–28 (quoting *Morrison,* 120 S.Ct. at 1749–51).

It is questionable whether these four considerations apply in this case. Courts applying the *Morrison* considerations have done so in cases involving facial Commerce

---

**11.** In framing their challenge in this manner, plaintiffs make the same mistake as the dissent in *NAHB,* which argues the take provision is unconstitutional as applied to "killing flies" and as applied in the abstract to "controlling weeds or digging holes." *See, e.g., NAHB,* 130 F.3d at 1064 (Sentelle, J., dissenting). As noted, however, this argument runs against the well-established rule that a plaintiff may constitutionally challenge either the application of a statute to *his own conduct,* or he may argue the statute, on its face, does not constitutionally apply to *any* conduct—he may not strike down the statute as unconstitutionally applied to some abstract class or subset of conduct.

**12.** The Court therefore need not, and does not, analyze whether the regulated activity also falls under the first and second categories. With respect to the first category, however, the Court does note that the Property is located at the corner of two major state highways that are both directly connected to Interstate Highway 35, and plaintiffs' proposed development would affect these highways. *Cf. Caminetti v. United States,* 242 U.S. 470, 37 S.Ct. 192, 197, 61 L.Ed. 442 (1917) ("[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.").

Clause challenges. *See Kallestad*, 236 F.3d at 228; *Gibbs*, 214 F.3d 483; *NAHB*, 130 F.3d at 1057.[13] In purely as-applied Commerce Clause challenges, the courts have analyzed only the effect of the specific activity on interstate commerce. *See Jimenez*, 256 F.3d at 339 (finding specific home office being regulated "would easily be classified as substantially affecting interstate commerce," without applying *Morrison* considerations). *Cf. Jones*, 120 S.Ct. at 1910 (finding "home owned and occupied by petitioner Jones's cousin was not so used [in interstate commerce, as defined by statute]—it was a dwelling place used for everyday family living," without applying *Morrison* considerations). The Court finds that, under either approach, defendants' application of the take provision passes Commerce Clause muster.

### A. Effect of Specific Activity on Interstate Commerce

 As noted, the regulated activity in this case is plaintiffs' alleged take of the Cave Species by their planned development of the Property. This development includes plans to build "a shopping center, a residential subdivision, and office buildings" on the Property. *See* Purcell Affidavit, ¶ 27. It also includes plaintiffs' proposal to build a Wal–Mart and an apartment complex on the Property. *See* Defendants' Summary Judgment Motion, Ex. 1. This activity, standing alone, "would easily be classified as substantially affecting interstate commerce." *See Jimenez*, 256 F.3d at 339 (upholding application of federal arson statute to single home office; finding home office substantially affected interstate commerce because it was primary location of a small construction business with gross receipts of $20,000 per month and payroll of $8,000 per month, and was location of business records and company vehicles); *NAHB*, 130 F.3d at 1059 (Henderson, J., concurring) (upholding application of take provision to "proposed redesigned traffic intersection and the hospital which it is intended to serve, each of which has an obvious connection with interstate commerce"). *Cf. Russell v. United States*, 471 U.S. 858, 105 S.Ct. 2455, 2457, 85 L.Ed.2d 829 (1985) ("The rental of real estate is unquestionably such an activity [that affects commerce].").

Plaintiffs mistakenly focus only on the commercial aspects (or, in their view, the complete lack thereof) of the Cave Species. However, the activity regulated in this case is not simply the Cave Species. It is an alleged take of the Cave Species through plaintiffs' development of the Property. Plaintiffs cannot simply ignore the commercial nature of their activity. *See, e.g., Groome Res., Ltd. v. Parish of Jefferson*, 234 F.3d 192, 204 (5th Cir.2000) (indicating regulated activity is examined in terms of the "actors" and the "conduct" being regulated) (quoting *Morrison*, 120 S.Ct. at 1750).[14] Indeed, plaintiffs them-

---

**13.** The procedural posture of *NAHB* is not entirely clear. While the majority makes reference to an as-applied challenge, in fact it analyzes only whether the take provision is constitutional on its face, under the Commerce Clause. Answering this question in the affirmative, it then concludes any application of the take provision (and therefore the particular application before it) is constitutional. The concurring opinion first concludes the take provision as a whole is constitutional, then concludes the application to the particular conduct at issue—building a hospital—is constitutional.

**14.** This is similar to another problem underpinning the *NAHB* dissent—the primary authority relied on by plaintiffs. Specifically, the dissent in *NAHB* acknowledges the "activity regulated in the present case" as being "local land-use" and "involv[ing] the application of the ESA to the building of a hospital and supporting infrastructure," but concludes

selves repeatedly describe defendants' application of the take provision in terms of the planned development of the Property. *See, e.g.,* Plaintiffs' Summary Judgment Motion, at 4 (stating defendants have "consistently asserted regulatory jurisdiction over the development activities on the Plaintiffs' property," on the basis that "Plaintiffs' proposed development plans will cause 'take' of the Cave Bugs in violation of § 9(a)(1)(B) of the ESA.").

Plaintiffs also contend the focus should not be on their planned commercial development of the Property because this type of activity is "not addressed by the express terms" of the take provision. *See* Plaintiffs' Response, at 11–12. However, the take provision broadly applies to any habitat modification that actually injures or kills endangered species by significantly impairing their essential behavioral patterns. Thus, it unquestionably covers commercial developments that have this effect. Indeed, one of the express purposes of the ESA is to prevent such developments from extinguishing endangered species. *See* 16 U.S.C. § 1531(a) (finding ESA was needed to protect species from being "rendered extinct by economic growth and development").[15]

Moreover, because the regulated activity in this case is economic in nature, the Court may aggregate the effects of similar activity for the purpose of determining the effect on interstate commerce. *See Morrison,* 120 S.Ct. at 1750 n. 4 (noting "the *Wickard* aggregation principle" applies when "the regulated activity was of an apparent commercial character"); *Jimenez,* 256 F.3d at 338; *United States v. Gray,* 260 F.3d 1267, 1274, n. 2 (11th Cir. 2001) ("Under the aggregation theory, eco-

this activity is not "commercial." *See NAHB,* 130 F.3d at 1064–66. This ignores the plain fact that a hospital, its construction, and the re-design of the adjacent traffic intersection are all commercial activities. For this and several other reasons, the dissent in *NAHB* is wholly unpersuasive. *See also* John C. Nagle, *The Commerce Clause Meets the Delhi Sands Flower–Loving Fly,* 97 Mich.L.Rev. 174 (1998) (explaining, in a well-reasoned article, the flaws in the *NAHB* dissent). Indeed, accepting plaintiffs' argument—that the Court should examine only the intrastate, non-economic nature of the Cave Species—likely would nullify the take provision as-applied in *TVA,* the primary Supreme Court decision on the ESA. In *TVA,* the ESA was applied to enjoin federal construction of a dam, to prevent the "destruction or modification of [the] habitat area" of the endangered snail darter fish. *See TVA,* 98 S.Ct. at 2286. The non-commercial snail darter, however, was located solely within Tennessee: "[T]he snail darter apparently lives only in that portion of the Little Tennessee River [an area near Knoxville] which would be completely inundated by the reservoir created as a consequence of the Tellico Dam's completion." *Id.* at 2285. In addition, adopting this argument would turn the ESA on its head: "According to

plaintiffs, if a species is abundant and scattered plentifully across state lines, Congress is fully empowered under the Commerce Clause to protect it. But when that same species becomes more scarce and its population reduced to a single state, Congress's hands are suddenly tied." *Building Indus. Ass'n of Superior Cal.,* 979 F.Supp. at 907–08.

15. Thus, plaintiffs' citation to *Solid Waste Agency of No. Cook County v. United States Army Corps of Eng'rs,* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) is misplaced. Plaintiffs contend the Supreme Court in that case was "highly skeptical" of the government's argument that "a municipal landfill" fell within the Clean Water Act's regulation of "navigable waters." *See* Plaintiffs' Response, at 12. Whether this is true or not, it has no bearing here. A "proposed commercial development" is indisputably within the type of activity Congress intended to be regulated by the ESA and the take provision. The *Solid Waste* dicta cited by plaintiffs is therefore inapplicable in this case. *Cf. Solid Waste,* 121 S.Ct. at 684 ("[W]e find nothing approaching a clear statement from Congress that it intended [the Clean Water Act] to reach an abandoned sand and gravel pit such as we have here.").

nomic activity that may not itself substantially affect interstate commerce may be regulated under the Commerce Clause if that conduct, in the aggregate, would have such a substantial effect."). Under this principle, it is obvious that the effect of building Wal–Marts and apartment complexes, in the aggregate, quite substantially affects interstate commerce.

■ Finally, merely because a federal regulation is designed to *restrict* interstate commerce does not render the regulation unconstitutional. A regulation restricting commerce is still a regulation affecting commerce. *See, e.g., Gibbs,* 214 F.3d at 495 ("It is well-settled under Commerce Clause cases that a regulation can involve the promotion or the restriction of commercial enterprises and development.").

In sum, the Court finds defendants' application of the take provision in this case is a constitutional exercise of the Commerce Clause power, because the activity being regulated, both standing alone or under the aggregation principle, would easily be classified as substantially affecting interstate commerce.[16]

## B. Application of *Morrison* Considerations

### 1. Economic Nature of Regulated Activity

■ Assuming the *Morrison* considerations fully apply to an as-applied challenge, the first inquiry is into "the economic nature of the regulated activity." *See Groome,* 234 F.3d at 204. The Supreme Court has established a fairly low hurdle here, indicating a regulated activity will be considered non-economic only if it has "nothing to do with commerce or any sort of economic enterprise, however broadly one might define those terms." *Morrison,* 120 S.Ct. at 1749; *see also id.* at 1750–51 (stating regulated activity need only be "some sort of economic endeavor" or be economic "in any sense of the phrase"); *Groome,* 234 F.3d at 208 ("[T]he *Morrison* Court provided an expansive reading of economic activity that affected interstate commerce, including as it did *Wickard's* regulation of homegrown and home-consumed wheat."). Similarly, the Fifth Circuit has stressed "[t]his circuit has also recognized a broad reading of commercial and economic activities under the Commerce Clause." *Id.; see also United States v. Bailey,* 115 F.3d 1222, 1228 n. 7 (5th Cir.1997), *cert. denied,* 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 764 (1998) ("The construction of the term 'commerce' is a practical one and embraces economic activity beyond that which is traditionally considered commerce."). Finally, the Fifth Circuit has indicated "the economic nature of the regulated activity" may be examined in terms of whether "the 'actors' [or] the 'conduct' of the regulation has a commercial character." *See Groome,* 234

---

**16.** In addition, the Court finds a genuine fact issue exists as to whether the regulated activity in this case also substantially affects the interstate scientific research market. *See Gibbs,* 214 F.3d at 494 ("Scientific research generates jobs."). The summary judgment evidence indicates scientists across the country have studied the Cave Species and transported them to/from the American Museum of Natural History in New York, the California Academy of Sciences, the Academy of Natural Sciences in Philadelphia, the Field Museum of Natural History in Chicago, and the Texas Memorial Museum. *See* Defendants' Summary Judgment Motion, Ex. 3, Tab B, at 157, 207–11 and 221; Tab C, at 242 and 249. The Cave Species were listed as endangered in part because "[c]ollection [of the species] for scientific or educational purposes could become a threat if [their] localities become generally known." *See* 53 Fed.Reg. at 36031. However, because this issue is independent from the grounds on which the Court grants summary judgment for defendants, it is unnecessary to preserve the issue for trial.

F.3d at 204 (quoting *Morrison,* 120 S.Ct. at 1750).[17]

 Plaintiffs' alleged take of the Cave Species by their planned development of the Property clearly qualifies as economic activity. Activity doesn't get much more economic or commercial in character than building a Wal–Mart, office buildings, and an apartment complex. The regulated activity at issue in this case clearly passes the first *Morrison* consideration.

### 2. Jurisdictional Element

The second *Morrison* consideration is whether the statute has an "express jurisdictional element" that restricts its application to activities that have "an explicit connection with or effect on interstate commerce." Neither the take provision nor 50 C.F.R. § 17.3 have such a jurisdictional element. However, because this is not a facial challenge, a jurisdictional element is not required, and likely is not even applicable. *See United States v. Bird,* 124 F.3d 667, 676 n. 8 (5th Cir.1997), *cert. denied,* 523 U.S. 1006, 118 S.Ct. 1189, 140 L.Ed.2d 320 (1998) ("In any event, jurisdictional elements do not necessarily preclude 'as-applied' Commerce Clause challenges."). In addition, because of the obvious economic and interstate nature of the specific activity being regulated in this case, the jurisdictional element inquiry is not relevant. *See Groome,* 234 F.3d at 211 ("We do note, however, that the requirement of a jurisdictional element in both *Morrison* and *Lopez* is relevant only

because there was no obvious interstate economic connection in those cases.").

### 3. Legislative History

The third consideration under the *Morrison* analysis is whether legislative history supports a judgment that the activity in question has a substantial effect on interstate commerce. *See Groome,* 234 F.3d at 211. The Fifth Circuit has stated this factor is relevant primarily when the regulated activity "deal[s] with an invisible effect" on interstate commerce. *See id.* In addition, as plaintiffs acknowledge in their summary judgment brief, "formal findings by Congress are not required" for a valid Commerce Clause regulation. *See* Plaintiffs' Brief in Support, at 5.

As discussed, the regulated activity in this case clearly does not deal with some "invisible effect" on interstate commerce. Therefore, this consideration is not particularly relevant here. In any event, the legislative history of the ESA contains ample findings demonstrating a relationship between the take provision and interstate commerce. The ESA findings state that the Act was passed to address "various species of wildlife ... [that] have been rendered extinct by economic growth and development." *See* 16 U.S.C. § 1531(a).[18] The findings also state the ESA was designed to protect the "value" of all species as a natural and commercial resource, because of their "esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people."

---

**17.** Thus, the inquiry is not limited "only to the terms of the statute," as plaintiffs contend. *See* Plaintiffs' Response, at 12. This is particularly true when, as here, there is no facial challenge to a statute or regulation.

**18.** A similar justification was given for listing the Cave Species as endangered. *See* 53 Fed. Reg. 36029, 36031 (Sept. 16, 1998) ("The primary threat to the five species comes from

potential loss of habitat owing to ongoing development activities."); *see also* Texas Parks and Wildlife Department, *Texas Threatened and Endangered Invertebrates,* at http://www.tpwd.state.tx.us/nature/endang/animals/kretscv.htm (last modified Dec. 10, 1999) (stating that "primary threat" to Cave Species is "the loss of habitat due to urban development").

*See id.* Quoting from the legislative history, the Supreme Court described the following as "[t]ypifying the sentiments" of Congress in enacting the ESA:

> The value of [our] genetic heritage is, quite literally, *incalculable.* From the most narrow possible point of view, it is in the best interests of mankind to minimize the losses of genetic variations. The reason is simple: *they are potential resources.* Who knows, or can say, what potential cures for cancer or other scourges, present or future, may lie locked up in the structures of plants which may yet be undiscovered, much less analyzed?

*TVA,* 98 S.Ct. at 2293–94 (quoting H.R.Rep. No. 93–412, at 4–5, U.S.Code Cong. & Admin.News 1973, p. 3001 (1973)) (emphasis added). The Supreme Court also noted Congress' intent, in passing the ESA, to strike a balance between economic growth and protecting endangered species (albeit a balance heavily in favor of the latter):

> Quite obviously, it would be difficult for a court to balance the loss of a sum certain—even $100 million—against a congressionally declared 'incalculable' value, even assuming we had the power to engage in such a weighing process, which we emphatically do not.... Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities.

*TVA,* 98 S.Ct. at 2298–2302.

The Court joins every other federal court to examine the issue, and concludes these findings have a rational basis.[19] *See, e.g., Gibbs,* 214 F.3d at 496 ("The full payoff of conservation in the form of tourism, research, and trade may not be foreseeable. Yet it is reasonable for Congress to decide that conservation of species will one day produce a substantial commercial benefit to this country and that failure to preserve a species will result in permanent, though unascertainable, commercial loss."); *NAHB,* 130 F.3d at 1050 ("The Committee Reports on the ESA reveal that one of the primary reasons that Congress sought to protect endangered species from 'takings' was the importance of the continued availability of a wide variety of species to interstate commerce."). Accordingly, the Court finds this third *Morrison* consideration weighs heavily against plaintiffs' claim that the take provision is unconstitutional as-applied in this case.

### 4. Attenuation of Relationship to Interstate Commerce

The final consideration under *Morrison* is an examination of whether the link between the regulated activity and interstate commerce is direct or attenuated. *See Groome,* 234 F.3d at 214–15. While the regulated activities in *Lopez* (mere possession of a gun near a school) and *Morrison* (committing a violent crime against a woman) required several logical links to connect the activities to some effect on interstate commerce, here the link is direct. Indeed, the Court is hard-pressed to find a more direct link to interstate commerce than a Wal–Mart.

Plaintiffs argue "the activity causing the take (land clearing and runoff from the development of the Plaintiffs' property) ... [is] *very* distantly removed from the actual take of the species." *See* Plaintiffs'

---

19. "The court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding." *Hodel v. Virginia Surface Mining & Reclamation Ass'n. Inc.,* 452 U.S. 264, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981).

Response, at 14 (emphasis in original). More specifically, plaintiffs contend the link between the development of the Property and the take of the Cave Species is attenuated because (1) the development causes runoff which (2) filters through the ground and then (3) "migrates through subterranean connections" until (4) it reaches the caves and (5) modifies the Cave Species' habitat. Under this view, every link is attenuated. As a practical and realistic matter, however, the courts treat development activities such as plaintiffs' as the direct cause of a take. *See, e.g., Sweet Home,* 115 S.Ct. at 2412 (assuming "logging activities ... will have the effect, even though unintended, of detrimentally changing the natural habitat of both [endangered] species"). In addition, the final rule listing the Cave Species as endangered states that "road, industrial, residential, and commercial developments that would adversely affect these species have already begun." *See* 53 Fed.Reg. at 36031. It is these activities that directly harm the species.

In sum, the Court finds defendants' application of the take provision in this lawsuit is a valid regulation of an activity that substantially affects interstate commerce, and therefore is a valid exercise of the Commerce Clause power. Defendants' summary judgment motion is granted in full.

## III. Federalism Concerns

Finally, the Court must address plaintiffs' concerns that upholding defendants' application of the take provision in this case will undermine our system of federalism. *See, e.g., Groome,* 234 F.3d at 215 (noting "the central concern of federalism as articulated in *Lopez* and *Morrison*—namely that federalizing certain spheres of authority blurs the federal/state distinction"). Plaintiffs contend allowing

defendants to apply the take provision here will undermine the "traditional state authority" to regulate wildlife and land use. *See* Plaintiffs' Brief, at 17–19. While these are certainly valid concerns, they do not compel a different result here.

First, despite plaintiffs' contention, wildlife conservation has long been regulated by both states and the federal government. *See, e.g.,* Eagle Protection Act of 1940, 16 U.S.C. § 668; Wilderness Act of 1964, 16 U.S.C. § 1131; Marine Mammal Protection Act of 1972, 16 U.S.C. § 1361; Lacey Act of 1981, 16 U.S.C. § 3371. *See also Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 119 S.Ct. 1187, 1204, 143 L.Ed.2d 270 (1999) ("Although States have important interests in regulating wildlife and natural resources within their borders, this authority is shared with the Federal Government when the Federal Government exercises one of its enumerated constitutional powers."). Second, while local land use and zoning is generally an area of state concern, "[i]t is well established that Congress can regulate even private land use for environmental and wildlife conservation." *Gibbs,* 214 F.3d at 500; *see also Groome,* 234 F.3d at 216 (upholding federal regulation of local land use through Fair Housing Amendments Act, because "it does not serve the balance of federalism to allow local communities to discriminate against the disabled").

Thus, while defendants' application of the take provision implicates two areas of law often regulated by the states, these areas are not exclusive arenas of state regulation. *Cf. Morrison,* 120 S.Ct. at 1754 ("The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States."). Rather, the states and the federal government share regulation of these areas.

And, where preserving endangered species is concerned, the Supreme Court has indicated that federal law may trump state regulations in both areas. *See Sweet Home,* 115 S.Ct. 2407 (upholding regulatory interpretation of ESA take provision, which protected wildlife on purely private lands, as reasonable interpretation of Congress' intent under the ESA). This Court will not hold otherwise.

## Conclusion

The take provision of the Endangered Species Act may not be the ideal federal statute. By its broad terms, it certainly covers purely local, intrastate activities having no connection whatsoever with interstate commerce. But that is not how the take provision has been applied here. The activity regulated in this case is clearly connected to interstate commerce.

Plaintiffs understandably are frustrated by defendants' conduct.[20] Defendants may have applied the take provision to plaintiffs in an unreasonable manner. That, however, does not make defendants' application *unconstitutional,* which is the only issue in this lawsuit. Similarly, plaintiffs may disagree with defendants' decision to apply the take provision in a manner that overwhelmingly favors species preservation at the expense of important local development. However, the Supreme Court has been "emphatic" that the courts are not the place for this balancing. *See TVA,* 98 S.Ct. at 2298. Plaintiffs' commercial development activities clearly fall within the broad reach of the ESA's take provision. If plaintiffs are unhappy with the scope of this thirty-year old statute, they must turn to Congress for relief.

**20.** Indeed, the Court has already found defendants' conduct in handling plaintiffs' Section 10(a) permit applications was "totally irresponsible" and "simply wrong."

**21.** In this opinion and order, the Court has in no way relied on the amicus briefs submitted

The Commerce Clause certainly has limits. But those limits are not implicated in this lawsuit. The regulated activity at issue here substantially affects interstate commerce. Accordingly, defendants are entitled to summary judgment on all plaintiffs' claims.

In accordance with the foregoing:

IT IS ORDERED that Plaintiffs' Summary Judgment Motion [# 25] is DENIED;

IT IS FURTHER ORDERED that Defendants' Summary Judgment Motion [# 30] is GRANTED; and

IT IS FINALLY ORDERED all remaining pending motions are DISMISSED AS MOOT.[21]

by the National Wildlife Foundation or by the Pacific Legal Foundation and Texas Justice Foundation, and has not relied on the Declaration of Darrell Ubick, which plaintiffs seek to strike.